## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No.: 05-30051-MAP |
| | ) |
| WILLIAM BELISLE | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR DOWNWARD DEPARTURE

### I.    INTRODUCTION

On November 14, 2005, William Belisle pled guilty to 18 U.S.C. §2252 (a) (4) (B)—

"Possession of Child Pornography". The Pre-Sentence Report, prepared by the United States

Probation Office, calculates Mr. Belisle's Total Offense Level to be twenty-seven (27)—which

provides for a sentence range between seventy (70) and eighty-seven (87) months. **See**

**Presentence Report ¶¶ 29-39.** In reaching this figure, the United States Probation Office

assigned a base offense level of eighteen (18) under the appropriate statute and adds twelve (12)

levels based upon the specific offense characteristics, while subtracting three (3) levels for Mr.

Belisle's acceptance of responsibility. **See Presentence Report ¶¶ 29-39.**

Mr. Belisle asserts (2) arguments in support of his Motion for Downward Departure.

First, should the United States Sentencing Guidelines (hereinafter "U.S.S.G.") be applied in this

matter, Mr. Belisle moves for a Downward Departure under § 5K2.0 based upon mitigating facts

and circumstances. This, Mr. Belisle contends, is in accordance with <u>Koon v. United States,</u> 518

U.S. 81 (1996) which allows the court to take into account individual circumstances that are

aggravating or mitigating. <u>Id.</u> at 92.

Alternatively, Mr. Belisle maintains that the U.S.S.G. were made advisory in the

Supreme Court's decision in <u>United States v. Booker,</u> 543 U.S. 220 (2005). Therefore, this court

1

is not obligated to apply the guideline ranges, nor the enhancements, and can sentence Mr.

Belisle as it sees fit taking into account the factors listed in 18 U.S.C. § 3553(a).

## II.    IN ACCORDANCE WITH THE U.S.S.G. MR. BELISLE SHOULD RECEIVE A DOWNWARD DEPARTURE UNDER § 5K2.0 FOR HIS MITIGATING CIRCUMSTANCES

The court may depart from the guidelines if it finds that there exists an aggravating or

mitigating circumstance of a kind, or to a degree, not adequately taken into account by the

Sentencing Commission in formulating the guidelines that should result in a sentence different

from that described. U.S.S.G. § 5K2.0 (citing 18 U.S.C § 3553(b)) (1998). The Sentencing

Commission has provided guidance in making departure decisions by listing certain factors that

are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases

for departure. Koon v. United States, 518 U.S. 81, 93-95 (1996). The Supreme Court has

adopted the following test for determining whether to depart: (1) What factors of the case make it

special or unusual? (2) Has the Commission forbidden departures based on those factors? (3) If

not, has the Commission encouraged departures based on those factors? (4) If not, has the

Commission discouraged departures based on those factors? Id. at 95.

The Koon Court emphasized allowing sentencing judges to weigh the facts and

circumstances in each case and to mitigate or magnify the sentence as those facts and

circumstances permit. 518 U.S. at 112. The Koon Court noted that the U.S.S.G. provides the

courts with a set of typical cases that embody the conduct that each guideline describes. Id. See

also, United States v. Rivera, 994 F.2d 942, 947 (1993). A case that falls outside of the

"heartland" case described by the Guidelines, due to its unusual features, is a candidate for

departure. Id. The Guidelines advise the sentencing courts of what factors make a case atypical

and take it out of the considered "heartland." United States v. Pereira, 272 F.3d 76 (1st Cir.

2001) (noting a defendant's irreplaceable care of a family member is a factor that takes a case out of the Sentencing Guidelines' heartland). If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland. Koon at 95-96.

Congress has deferred to the Commission the role of deciding what constitutes a sufficient sentencing range in the typical case, consistent with these purposes. But that range contemplates only the typical case, one that falls within the so-called "heartland." See U.S.S.G. Manual Ch. 1 Pt. A at 6 (1998). If the circumstances of the case reveal that the purposes of sentencing have been fully or partially fulfilled prior to the imposition of sentence, a sentence within the range set forth by the guidelines may be "greater than necessary" to satisfy those purposes. 18 U.S.C. § 3553(a).

In 2003, Congress passed the Prosecutorial Remedies and Tools Against the Exploitation of Children Today ("PROTECT") Act, Pub. L. 108-21 (2003). The PROTECT Act, as implemented by the Sentencing Commission, eliminated certain factors as grounds for departure, restricted the availability of other factors, and adds language to the Guidelines Manual and policy statements that is intended to clarify when departures are appropriate. Under U.S.S.G. §

3

5K2.0, the PROTECT Act describes departures as appropriate only when "the sentencing court finds that there exists an aggravating or mitigating circumstances or a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . . ." U.S.S.G. § 5K2.0.

In the following matter, although individual downward departures have been eliminated by the PROTECT Act for this type of conviction, when viewing the totality of the circumstances a downward departure is appropriate and warranted. Koon, 518 U.S. at 93-95 (1996). See United States v. Cook, 938 F.2d 149, 152 (9th Cir. 1991); United States v. Pena, 930 F.2d 1486, 1495-96 (10th Cir. 1991); United States v. Iaconetti, 59 F. Supp. 2d 139 (D. Mass. 1999). Specifically, certain events that Mr. Belisle experienced as a young man, the reliance his family has on his presence, and the evaluations by Dr. Sherry and Tom Levy combine to warrant a downward departure from the proposed U.S.S.G. sentencing range.

Mr. Belisle experience two (2) very traumatic events at a young age which should be considered as a mitigating circumstance. At the approximately the age of thirteen (13), Mr. Belisle was "fondled" by a male neighbor. **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** Shortly thereafter, another older male "'tricked' Mr. Belisle into going into a barn where he forced Mr. Belisle to bend over so that he could penetrate him anally." **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** This abuse—suffered at such a young age—should be considered a mitigating circumstance. Dr. Sherry describes this abuse as distorting Mr. Belisle's view of sexual intimacy and thus contributing—as a factor—to Mr. Belisle's psychological problems **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.**

In light of this abuse, Mr. Belisle's mental and emotional condition becomes relevant and removes this matter from the contemplated "heartland" that the guidelines provide for and thus a

4

downward departure is appropriate. The Second Circuit in, <u>United States v. Rivera</u>, 192 F.3d 81, 85 (2nd Cir. 1999), concluded that "district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense." Although the Court in <u>Rivera</u> did not find that the abuse was sufficient for downward departure, the Court indicated what it considered sufficiently extraordinary abuse as appropriate grounds to depart downward. The Second Circuit cited <u>United States v. Vela</u>, 927 F.2d 197, 199 (5th Cir. 1991), and acknowledged that "[a] defendant's family history of incest or related treatment can cause the defendant to incur a mental or emotional condition that affects criminal conduct." The District Court found that the defendant's family life was shocking and repulsive; however, the court also found that the defendant freely chose to participate with her family in criminal activity and declined on that basis to depart downward. <u>Id.</u> at 198.

The opposite is true here. Mr. Belisle's male neighbors took advantage of a young and venerable boy and subjected him to a traumatic event. **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** This type of abuse significantly affected Mr. Belisle thereafter and is one reason why he has had emotional trouble in his life. **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** These extraordinary circumstances allow the court to depart downward from the guidelines in this situation.

Furthermore, in viewing the totality of the circumstances, another factor to consider is Mr. Belisle's commitment and dependability that he has towards his immediate, as well as his extended family. The First Circuit allows downward departures based on familial relationships when the circumstances are exceptional. See <u>Pereira</u>, 272 F.3d at 76. See also <u>Rivera</u>, 994 F.2d at 953 (allowing departure in circumstance where a family member is solely responsible for an

infant or disabled family members care); United States v. Sclamo, 997 F.2d 970, 973 (1st Cir. 1993) (noting that the presence of a live in boy friend was so vital to the emotional well being of a child in the house that downward departure was warranted). In Pereira, the First Circuit reversed and remanded the district court's downward departure explaining that the defendant's care of his parents fell "short of...[an] extraordinary circumstance." 272 F.3d at 76. The defendant in Pereira spent only 20 hours per week caring for his parents and there were also a multitude of friends and family that contributed to the care of both elderly parents. Id. The First Circuit held that the availability of other friends and family to assist the elderly parents removed the defendant from the irreplaceable caretaker category. Id.

In this matter, Mr. Belisle is the main provider, financially and emotionally, for both his wife, Linda Belisle, and his daughter, Bridget Belisle. **See Exhibit "B"—Letter from Linda Belisle.** Linda Belisle describes Mr. Belisle as the "main breadwinner in the family" and indicates that his absence from their family would be "a financial burden" on her and their daughter Bridget. **See Exhibit "B"—Letter from Linda Belisle.**

Further, Linda states that his absence would be emotionally difficult for her and Bridget. **See Exhibit "B"—Letter from Linda Belisle.** Bridget Belisle, Mr. Belisle's eighteen (18) year-old daughter, is currently undergoing physical and emotional problems. Mr. Belisle has always been a financial resource for Bridget as well as figure of emotional support and authority while Bridget battles with her own issues. Recently, Bridget has had problems with a lymph node in her neck, in which a growth has been removed already. Unfortunately, the growth has returned and yet another surgery must be performed in the near future. **See Presentence Report ¶ 60.**

Bridget has also been struggling with depression and Attention Deficit Disorder since the age of twelve (12). **See Presentence Report ¶¶ 60-63.** This has caused Bridget problems at

school and with the law. **See Presentence Report ¶¶ 60-63.** However, Mr. Belisle—along with Linda—have been supportive of Bridget through her struggles and continues to be a source of financial and emotion stability for her. Linda Belisle indicates that Mr. Belisle's absence will be "especially hard on [their] daughter." **See Exhibit "B"—Letter from Linda Belisle.**

Mr. Belisle is also very close to his mother, Ann Belisle. Ann Belisle indicates that Mr. Belisle is an indispensable part of their family. **See Exhibit "C"—Letter from Ann Belisle.** At age nine (9) Mr. Belisle's father left their home and according to Ann Belisle, thereafter Mr. Belisle's only response whenever providing help to his mother or sisters is "that's my job". **See Exhibit "C"—Letter from Ann Belisle.** Over the years, Ann and her daughters have come to rely on Mr. Belisle's presence for help financially and emotionally. **See Exhibit "C"—Letter from Ann Belisle; See Exhibit "D"—Letter from Louise Chase; See Exhibit "E"—Letter from Suzanne Crowther.**

Louise Chase, Mr. Belisle's sister, describes one specific example of such support. **See Exhibit "D"—Letter from Louise Chase.** Louise Chase indicates that Mr. Belisle was supportive of her financially, emotionally, and by doing home repairs while her daughter, Mr. Belisle's niece, battled an illness that hospitalized her for approximately one (1) year. **See Exhibit "D"—Letter from Louise Chase.** This is but one example of the support that Mr. Belisle extends, not only to his immediate family, but also to his extended family as well and the dependence that they all have on him.

Based on the dependence that Linda Belisle, Bridget Belisle, Ann Belisle, Louise Chase, Suzanne Crowther, Tom Belisle, and the rest of Mr. Belisle's family has on him the court should depart downward from the proposed guidelines.

Additionally, the court should also consider Dr. Sherry's report and Tom Levy's letter regarding Mr. Belisle's problem with addiction and the strides he has made in controlling and beating this addiction. **See Exhibits "A" and "F".** Specifically, Mr. Levy indicates that Mr. Belisle has made the link to his addictive behavior and appears to be committed to making progress in this area. **See Exhibit "F"—Letter from Tom Levy.** While Dr. Sherry suggests that Mr. Belisle "compartmentalized his sexual interests in children" and thus "his interest on images of child pornography . . . was not a prelude to action, a preparation for action, or a rehearsal for action." **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** Ultimately, Dr. Sherry says that Mr. Belisle's interest "appeared to be solely fantasy based." **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.**

Dr. Sherry further states that Mr. Belisle "has seemingly given up his fascinations and involvement with deviant and taboo pornography . . . ." **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** This, Dr. Sherry notes, would not be possible if Mr. Belisle were "'haunted' by child pornography and [had] a sexual attraction to children." **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.**

These evaluations should be used when determining Mr. Belisle's sentence as they show an individual who is committed to overcoming his addictions, as well as provide insight as to lack of a threat that Mr. Belisle is towards the community. This shows that Mr. Belisle is not likely to be a recidivist and his sentence should accordingly reflect this diminished likelihood.

Taken as a whole, Mr. Belisle's case proves to be one in which a combination of factors supports a downward departure. Mr. Belisle suffered sexual and mental abuse as a young boy which has affected him for the rest of his life. **See Exhibit "A"—Dr. Sherry's Psychological Evaluation of William Belisle.** Furthermore, as discussed earlier, Mr. Belisle has spent the

majority of his life as the caretaker for his immediate and extended family. Beginning with his wife and daughter, and carrying over to his mother and sisters. Mr. Belisle's family relies on him to provide financial, emotional, and physical support to them on a daily basis. Finally, the report by Dr. Sherry and the letter by Tom Levy show Mr. Belisle's commitment to rehabilitation, as well as his lack of danger to the community or to repeat his offenses. These combinations of factors should be sufficient mitigating circumstances and takes Mr. Belisle's case out of the "heartland" of the guidelines thereby warranting a departure.

In this matter, the Defendant, William Belisle, respectfully requests this court to depart from the U.S.S.G. and impose a sentence of twenty-four (24) months of incarceration.

**III.    ALTERNATIVELY, MR. BELISLE MAINTAINS THAT THE SENTENCING GUIDELINES HAVE BEEN MADE ADVISORY BY THE SUPREME COURT'S DECISION IN UNITED STATES V. BOOKER AND THIS COURT IS NOT OBLIGATED TO APPLY THE GUIDELINES RANGES AND MAY SENTENCE MR. BELISLE BELOW THE RANGE AS IT SEES FIT.**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court reaffirmed their holding in Apprendi v. New Jersey, 530 U.S. 466 (2000) and applied their holding in Blakley v. Washington, 124 S. Ct. 2531 (2004) to the federal sentencing guidelines. The Booker decision rendered the federal sentencing guidelines "advisory", but the "Breyer majority" held that the district court can still find facts at sentencing that increase the guideline range beyond the facts found by the jury or admitted by the defendant, though subject to a "reasonableness" standard on review and still subject to the Apprendi limitations on increasing sentences beyond the statutory maximum. In this matter, the court is not bound to adhere to the guidelines for sentencing purposes and may chose to sentence Mr. Belisle to how it sees fit.

In imposing sentence, a court must always consider the purposes of sentencing. Congress set forth those purposes in 18 U.S.C. § 3553(a). Under that provision a court should consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing ranges; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

Specifically, Mr. Belisle requests that this court pay particular attention to factors one (1) and two (2) of 18 U.S.C. §3553(a). With regards to factor one (1), as discussed above, Mr. Belisle has several mitigating factors which make a sentence of twenty-four (24) months of incarceration a just sentence. Mr. Belisle's emotional and physical abuse as a young man, his family situation, and his commitment to rehabilitation—when combined with the factors in 18 U.S.C. § 3553(a) and the Supreme Court's holding in Booker—are all mitigating factors which should be considered.

When assessing this matter under factor two (2), it should be noted that both Dr. Sherry and Tom Levy express their doubts that a lengthy sentence is necessary for Mr. Belisle as neither see Mr. Belisle as a threat to his family or the community. **See Exhibits "A" and "F".** This dispels some of the fears that Mr. Belisle will be a repeat offender makes a length sentence unwarranted.

In light of these factors, Mr. Belisle requests this court impose a sentence of twenty-four (24) months in this matter.

## V.    CONCLUSION

The Defendant, William Belisle, respectfully requests this honorable court to either depart from the U.S.S.G. by applying the above-mentioned mitigating factors or not apply the

10

U.S.S.G. as they are advisory under <u>Booker</u> and sentence Mr. Belisle to a term of incarceration of twenty-four (24) months.

Respectfully Submitted,
William Belisle
By His Attorney:


Joseph D. Bernard /dfr
Joseph D. Bernard
The Law Offices of Joseph D. Bernard, P.C.
73 State Street, Suite 301
Springfield, MA 01103
(413) 731-9995
BBO#: 557986

Date:   February 21, 2006

# EXHIBIT A



MICHAEL SHERRY, PH.D.
#217
351 PLEASANT STREET
NORTHAMPTON, MA 01060
(413) 584-2852


PSYCHOLOGICAL EVALUATION
WILLIAM BELISLE  (DOB: 11/14/59)
12/20/05


Atty. Joseph Bernard requested that I evaluate Mr. Belisle, a 46 year old
married father of one daughter, prior to sentencing for his involvement in
Criminal Action 05-30051–MAP in the United State District Court, District
of Massachusetts.

To that end, I interviewed and tested Mr. Belisle on 12/5/05 and 12/11/05.
Testing consisted of a standard psychological test battery, including the
Rorschach, the Thematic Apperception Test (TAT), and the Personality
Assessment Inventory (PAI). I spent 6.75 hours with Mr. Belisle. I also
spoke by telephone with Mr. Belisle's wife Linda.  I spoke by phone with
Mr. Belisle's outpatient therapist Thomas Levy LMHC at the Griswold
Center. I also reviewed material sent to me by Atty. Bernard, specifically
the Application and Affidavit for Search Warrant written by Special Agent
Andrew Litowitz on 11/10/04.


## ALLEGATIONS

According to the "Affidavit for Search Warrant," Mr. Belisle posted
to a Yahoo Group entitled "trade-stats" four files containing 10
pictures depicting naked minor females (one was only of a minor
female) engaged in sexual activity with male figures.  Mr. Belisle
allegedly logged in to his account at Yahoo 44 times between 8/8/04
and 8/26/04. On his group profile, Mr. Belisle reported that his
marital status was " married but looking," that his hobbies included:
"sex young girls…I wish," and that his interests included :"Strangers
with Candy," "Cherry Poppin' Daddies," and "Child's Play Series."
In the request for a search warrant, Special Agent Litowitz wrote:

"I have probable cause to believe that William J. Belisle,(sic) has knowingly received child pornography, transported or shipped in interstate or foreign commerce by any means, including computer…I also have probable cause to believe that evidence of the possession and transmission of the child pornography will be found at William J. Belisle's residence…"

## RELEVANT BACKGROUND INFORMATION

This information is based primarily on Mr. Belisle's report except where noted.

William Belisle is the second oldest of four children born to his parents. His father worked as a real estate agent and developer, a man described by Mr. Belisle as always having a scheme to get rich. His father apparently did not have a problem with drugs or alcohol and was never physically rough with the children or Mr. Belisle's mother. He did, however, have many girlfriends while married, which became known to Mr. Belisle when he was 16. He learned that he has a half-brother "somewhere."

Mr. Belisle's mother worked in the Treasury Office at the state school in Monson. After she and her husband separated when Mr. Belisle was approximately 9, she was, according to Mr. Belisle, the "mom and dad" for the children. Mr. Belisle stated that his mother, a sweet person who was always there for the children, always had to struggle financially to make ends meet. He stated he was always his mother's favorite. However, Mr. Belisle did not see his father often; although his father would sometimes move back home for a while, when he was living outside the home, he would sometimes not take the children when he was supposed to every other weekend.

Mr. Belisle described his childhood as being different from his older brother's; his older brother was the "adventurous one" who worried their mother by numerous hitchhiking trips back and forth to California. Mr. Belisle described himself as "*stuck behind*, helping my mother, helping her with things that were broken, helping with my sisters."

When Mr. Belisle was 13, a male neighbor rubbed up against the front of his pants. He stopped when Mr. Belisle told him he did not like it. Also around that time, another older man tried unsuccessfully to have Mr. Belisle perform oral sex on him. This same man once "tricked" Mr. Belisle into going into a barn where he forced Mr. Belisle to bend over so that he could penetrate him anally. "I was frightened and it hurt and got him to stop." Mr. Belisle did not tell anyone about these incidents. He stated he has been heterosexual in all of his sexual activities, other than these encounters.

Mr. Belisle described himself as an active and busy youngster with many friends, involved in 4 H. He loved fishing and hunting. He graduated from Ludlow High School and worked at Smith and Wesson; however, he could not tolerate the repetition and took another job at a railroad company, unloading train cars. He found this job to be boring as well. He next worked for many years for an envelope company. He entered the construction field and "did something stupid" when he went into commercial construction full time on his own. In time he worked remodeling Friendly's restaurants. In 1994, he started another company and worked on various projects abroad. For example, he worked on constructing playgrounds in Chile. Another job was changing the menu boards at 500 McDonald's. His company grew too fast, he dispatching and traveling with as many as 10-15 crews. But the growth led to financial problems; eventually he stated that his company lost $150,000 on some contracts.

Since 2000, Mr. Belisle has been working as a supervisor for someone else's company.

Mr. Belisle's heterosexual history began in his teenage years. He had an occasional girlfriend in junior high and high school. He had intercourse for the first time the night of graduation when he was dumped by his girlfriend and another girl pursued him. He described their sex on that one night as "all of ten seconds." He had other girlfriends, nothing serious, until he was 19 when he met Linda, his wife to be.

Mr. Belisle stated that he and Linda shared the same friends and often had fun together. He was at a loss to describe what he liked about her when they first became involved. However, half-heartedly he stated he was attracted to her and the sex for the two of them was great. He added that Linda, who came from an emotionally reserved family, initially had trouble adjusting to the more emotionally expressive Belisle family.

Mr. Belisle stated he and Linda decided to marry when they were both 22 in 1981. He stated that he had always had a fear of being alone so marriage made sense to him. In 1987 Linda gave birth to their only child, Bridget, currently 16.

Mr. Belisle stated that after Bridget was born, Linda no longer wanted to have sex. "I'd have to beg Linda for sex." He stated he would go years without having sex with his wife. He stated it would take great effort on his part until she eventually consented. He stated they last had sex three years ago. He described their relationship as being more like roommates than husband and wife. He stated he and Linda never talked about the sexual side of their relationship. He recalled one night when Linda told him to have sex with a female boarder who lived with them and helped baby-sit their daughter. He did not take her up on this offer. However, he stated he has

made mistakes in the marriage and while on the road, was unfaithful. He stated that after the FBI investigation began, he told Linda about having had relationships outside of the marriage, and she acknowledged having done so as well.

Mr. Belisle was often away on business in the 1990s, including time out of the country. He stated that during one two month period, he was home all of 17 hours. He stated he needed to be away on business in order to make enough money to support his family. He stated that on a few occasions, he would visit prostitutes who he estimated were in their late 20s/early 30s. They would not have intercourse, but instead he would receive oral sex and manual masturbation. He found the activity to be "exciting because it was forbidden" although he would also feel a "little bit guilty" afterward. While on the road with his crew, he would also visit strip clubs, he estimated, once every three to four weeks. Occasionally he would pay for a lap dance but found the cost to be prohibitive.

Mr. Belisle estimated that he had approximately four to five extramarital relationships while on the road. Two to three of them were solely sexual and apparently not that long-standing. He had a longer affair with a woman in Michigan. But his longest relationship was with a woman Donna in New Jersey. They were involved for seven years from 1993 until 2000. Mr. Belisle stated this relationship began as a sexual relationship but grew into something that was more emotional. Mr. Belisle found Donna to be "very caring, compassionate and nurturing…she worried about me…I cared for her quite a bit." He found in this relationship the emotional closeness he had stopped feeling for Linda. He thought of leaving Linda for Donna but stated he could not accept the idea of leaving his daughter. He stated he also know that if he left Linda, both he and Donna would feel too guilty and their relationship would not last. His relationship with Donna ended in 2000 when she went back to the Church and refused to see him.

Approximately four to five years ago, Mr. Belisle and his wife became concerned about their daughter Bridget who was in the 6th grade. She began hanging out with a "bad crowd." When she was 13, she was charged with Assault when, in an argument with another angry girl, she said "I'm gonna kill you." Bridget would not heed Linda and was getting wild in school. She was tested and diagnosed as having Attention Deficit Disorder. She would stay out at night and once vandalized the gazebo in Monson. She was charged with shoplifting. She also has drug paraphernalia and acknowledges smoking marijuana. Mr. Belisle stated he often worries about Bridget whom he described as depressed. She cut herself at least once while in high school. She has never been psychiatrically hospitalized but has been on antidepressant medication.

When Bridget was 16, Mr. Belisle was worried that she would run "far away." Considering this next option to be better than losing track of his daughter, Mr. Belisle seemed to have allowed (he may not have had much of a choice) her to move in with a local teenager a few years older than herself. He stated he and his wife see her everyday and that Bridget is afraid to be alone. "We want her to see a doctor but she refuses to go." She stopped school and is apparently working for her GED.

After his arrest, Mr. Belisle was distraught and depressed. He thought of ending his life by walking into traffic. His wife suggested he see a therapist. He began seeing a therapist, Tom Levy LMHC, at the Griswold Center. According to Mr. Levy, Mr. Belisle came to see him because he wanted help with his addiction to pornography. Mr. Levy found him to be open and forthcoming. He stated that Mr. Belisle had not been having sex with his wife but had been having sex with other women while away on business. In the past few years, he became fascinated with pornography on the internet as an outlet for his sexuality. Mr. Levy stated Mr. Belisle started with adult pornography but when that lost its charge, he searched for something that was more titillating for an added jolt of arousal.

Mr. Levy believed that Mr. Belisle could "compartmentalize" his sexual interests. By this, he meant that Mr. Belisle could look at child pornography on the internet but maintain an appropriate non-incestuous relationship with his own daughter. He stated that Mr. Belisle did not view his daughter as a sexualized object but rather as a person whose best interests he has kept in mind. Mr. Levy stated that one of the focuses of therapy has been on helping Mr. Belisle be a better parent to his daughter.

Mr. Levy stated that in treatment, Mr. Belisle has "lain his soul bare." According to Mr. Levy, the arrest "scared the hell out of" Mr. Belisle. He added that his client stays away from the computer, that he now has "the fear of God about the computer." He also thought that Mr. Belisle has repaired somewhat his relationship with his wife. He stated that his client is bracing himself for the worst legally.

With me, Mr. Belisle was adamant that he never touched Bridget inappropriately. He has considered unfair the prosecution's attempts to link his interest in child pornography with his daughter's psychological problems.

According to Ms. Belisle, Mr. Belisle's wife, her husband had always been very patient with Bridget, very close to her, and always a good father. She has never suspected him of ever touching their daughter inappropriately. She stated she was shocked to learn he was looking at child pornography although she knew he looked at adult pornography on the internet. She stated he apologized to her after his arrest numerous times and leveled with

her about his affairs. She acknowledged that they were emotionally apart for years when he was on the road but added that they talk more now together.

INTERVIEW BEHAVIOR

Mr. Belisle was fully cooperative during this evaluation. At no point did he hesitate to answer any of my questions. He stated this evaluation had caused him more anxiety than any other aspect of the proceedings since his arrest because he did not have any idea what I would write about him. He was contrite about what he had done, stating that he had done something "really stupid" when he was looking at child pornography. Twice he stressed that what upset him, perhaps the most, was when he was told by the FBI agents that by pursuing child pornography, he was hurting children. "I was shocked when the FBI told me girls were being hurt" in the making of the pornography. "I wasn't thinking too good at the time." He was the most adamant with me when he stated he had never touched inappropriately any child, including his daughter. The only time he cried during this evaluation was when he insisted he had never touched his daughter. He was frustrated that the prosecutors were attempting to link his daughter's psychological problems to his prurient interests, with the implication, he believed they were trying to make, that he had molested his daughter.

In my experience, Mr. Belisle was far more open than most other clients---be they forensic clients, be they non-forensic clients, be they those with sexual offenses---when answering questions during this evaluation about sexual matters. For the most part, his answers were detailed, and he did not shy away from answering sexual questions. My sense was that he felt he had to be as open and forthcoming as possible. He is not someone who I would describe as being in denial regarding his past behavior. He also is not someone who would be sufficiently sophisticated to attempt readily to deceive.

Nevertheless, it is always difficult to tell when someone being evaluated under these conditions is telling the truth, or minimizing his actions, or being deceitful, or being truthful in some answers, less than honest in others. In general, I found Mr. Belisle to be open. However, there was one time during this evaluation when I suspected the most that Mr. Belisle was not being honest with me. This occurred when I asked him about his Yahoo profile where he had written as to his hobbies: "sex young girls...I wish." He stated he wrote "young girls" because he had always had trouble spelling the word "women." The implication here was that had he been confident about spelling the word "women," he would have written "young women" but since he was not certain of the spelling, he wrote "young girls." Given his interest in incest-related pornography, and his list of other interests as "Strangers with Candy," "Cherry Poppin''Daddies," and "Child's Play

Series," I am most skeptical that he wrote "young girls" because of his concern about his spelling deficiency.

I was also concerned about the other reason that he gave for his comments on his Yahoo profile. He stated that he considered what people wrote about themselves on the internet to often be fiction---that a man could pretend to be a woman, or a woman a girl. He stated that when he looked at images and pictures on the internet, he thought they were "fake" and that the comments he wrote on his Yahoo profile, were a "bunch of bull...I was kinda kidding." I also find this statement---that what he wrote was a "bunch of bull...kinda kidding"--- to be disingenuous, considering his interests. He may have been saying that he was "just kidding" about *acting in the physical world* on his sexual interests in children, but I do not believe that he was "just kidding" about his sexual interest.

## PSYCHOLOGICAL TESTING

Mr. Belisle was administered three psychological tests: the PAI, Rorschach, and TAT. It should be noted that often psychological testing does not illuminate significant psychological problems that are directly related to sexual offenses. In other words, there is not a psychological test profile for a child molester or a rapist or a purveyor of children's pornography. Psychological testing does, however, provide a fuller picture of a person's personality.

The PAI is a 344 item true-false objective personality test in which the test taker's responses are entered into a computer for a report. The report presents a picture of the person's level of emotional disturbance, kind of disturbance, and other personality factors. On the PAI, Mr. Belisle presented himself in a reasonable forthright manner. He did not endorse items about himself that would indicate that he is suffering from significant symptoms of a mental illness, such as depression, anxiety, thought disturbance, paranoia, or mania. His attitude about himself varies from states of pessimism and self-doubt to periods of relative self-confidence. During stressful times, he is prone to be self-critical, uncertain, and indecisive.

Also on the PAI, Mr. Belisle presents himself as someone who is friendly and extroverted. He will usually present as cheerful and positive when in the presence of others. He usually prefers activities that bring him in contact with others, rather than solitary pursuits. He sees himself as a person with many friends and as one who is comfortable in most social situations.

Based on the PAI and interview, Mr. Belisle is not suicidal. He describes himself as a very meek and unassertive person who has

difficulty standing up for himself, even when assertiveness is indicated. He may have some difficulty in the appropriate expression of anger.

Also based on the PAI, Mr. Belisle is someone who is interested and motivated to be in psychological treatment. He acknowledges important personality problems and recognizes that he needs help in dealing with these problems. Based on the PAI, he would be most likely diagnosed as suffering from a mild psychological disturbance, an Adjustment Disorder with Anxiety. This diagnosis is often given to people who are facing with anxiety some change in their life. A man without a criminal record charged as Mr. Belisle has been charged and anxious about sentencing would fit this diagnosis.

Mr. Belisle was also administered the 10 card Rorschach Inkblot Test in which he says what he sees when looking at ambiguous inkblots. His responses indicate that he is someone who tends to approach life with a narrow focus, to miss the nuances of social and interpersonal situations, and to arrive at decisions without having given them much thought. He does not have difficulty perceiving the world accurately and seeing the world as others often see it. He is for the most part a conventional man in his outlook toward life. He is not a particularly complex person psychologically. Although he is not someone who is currently overwhelmed nor overly stressed, he is subject to feeling depressed and emotionally upset. The only response on the Rorschach that was noteworthy to me was his response "vagina" to a part of a card that at times elicits that response. What was remarkable to me was not the response "vagina" per se, since other people also give that response, but that Mr. Belisle, in his current situation, would give that sexual response when he could have chosen to have kept the response to himself. It suggested to me that Mr. Belisle, at least during this test, was open, forthcoming, and naïve about the possible implications of his answers.

On the TAT, a story telling test in which Mr. Belisle was asked to tell stories to ambiguous pictures of people, Mr. Belisle showed that he is someone who struggles currently with depressed feelings. He feels that he must face now worries and anxieties, which he wished were not at him. He also is someone who most likely has felt that his lot in life has often been to be stuck in situations---his biological family in which he had to look after his mother, his marriage in which he did not feel affection and desire coming toward him, his jobs in which he felt he had to tolerate boring repetition or too great demands. He has tried to minimize and normalize the trapped feeling but nevertheless, he has felt it. Finally, as he did on the

Rorschach, when presented with a picture with a clear sexual content which some people will manage to sidestep by telling non-sexual stories, Mr. Belisle did not hesitate to tell a sexual story. Again, I suspect that this indicated that he was not particularly guarded on testing.

It should be noted that some people, not all, not even the majority, who have committed sexual offenses, particularly pedophilia, will offer psychological test responses that reveal their prurient interests. None of those kinds of responses were present in Mr. Belisle's test battery. Nor were responses present that indicated an interest in dominating and controlling those with less power nor responses indicative of impaired impulse control and aggression.

### MR. BELISLE'S ACCOUNT OF HIS BEHAVIOR REGARDING CHILD PORNOGRAPHY, HIS ARREST, AND SUBSEQUENT EVENTS

According to Mr. Belisle, on Nov. 12, 2004, five FBI agents raided his house, took his computer and discs, and brought federal charges related to child pornography against him.

During this evaluation, Mr. Belisle stated that over the past few years, living at home, working in a supervisory position with fewer opportunities for camraderie with his construction team, sexually frustrated because of the lack of sexual relations with his wife, he became more involved with pornography on the internet.

Earlier, in the 1990s, when on the road working away from home, sometimes for many weeks at a time, he would sometimes go to bars, including strip bars, with his fellow workers; as previously stated in this report, on a rare occasion he would visit a prostitute and also maintained a number of extra marital relationships. More typically, he would stay in his hotel room at night. He would buy magazines such as *Playboy* and *Penthouse* but considered the models to be "plastic. His goal when looking at the magazines was masturbation, which he would do in the privacy of his hotel room. He estimated that he would masturbate nightly or every other night. Over time he found himself more attracted to "swingers magazines" in which couples would be looking for sexual opportunities with other people. He also was aroused by sexually explicit stories, which he would read in adult magazines. He found himself aroused by stories of incest and both consensual and non-consensual sex. The most arousing stories were those in which a taboo was broken, he stated. Consequently, he was attracted to stories of mother-son incest, father-daughter incest, and sex between cousins, nieces,

nephews, aunts and uncles. The main sexual activity in the stories that aroused him was intercourse. Mr. Belisle stated that he never had any desire to have in the real physical world the kind of sex that aroused him in fantasy.

In 2000-2001, according to Mr. Belisle, when he changed jobs and was based at home, he became interested in the computer as a source for his interests in pornography. He stated he started out simply clicking on various pop-up ads, finding pictures and stories of interest by trial and error. He estimated that he would sit down at his computer for a few hours, randomly searching while his wife and his daughter were in bed. He used passwords to keep his computer material private. He would sometimes enter chat rooms in which there was much sexual talk, flirting and innuendo. On occasion, he and his wife would together enter the chat rooms. He said that it was possible to "get nude" on some of the chat rooms (I gather one would use some form of digital camera for this; I do not know if Mr. Belisle, either alone or with his wife, ever exercised this option). He stated usually when he went into one of these sexually-themed chat rooms, he would do so to "gawk." He denied making contacts with other people in the chat rooms.

Mr. Belisle stated that he was getting bored with the kind of adult pornography he was looking at on the computer and was open to what he considered to be something that was more daring. He would respond to "pop ups" and ads, including ones for "young this, or young that." He was attracted, he stated, by that which was different. He stated "my absolute main focus was never just children…I was looking at everything." He stated that it was more the "taboo" of the image rather than the particular content of the image that aroused him; the more taboo, the more arousing. He would masturbate to different images, be they adult or teenagers, always female. He did not like images of younger children, preferring, when looking at juveniles, to look only at teenagers. He stated once he was sent a picture of a real young child, which he did not like, and he deleted it.

Mr. Belisle stated he belonged to a number of groups on the internet, some sexual, some not (jeeps,f or instance). Some were related to swingers. He stated he never communicated with anyone in any of the groups. He stated that someone, perhaps a "contact from an incest forum," e-mailed him an invitation to the group "trade stats"(this "contact" suggests some communication between him and someone in a group). He stated that to join the group it was necessary to post two pictures. He could not remember exactly what he posted but was "pretty sure it was just single pictures of naked girls…I know I didn't send a set of pictures." He also acknowledged

having discs of sexual images that included both adult and child pornography. He stated he downloaded these images onto the discs because he once had a virus on his computer. He guessed that there were between 7 and 10 illegal pictures of "kids, girls in sexual situations, giving oral sex." He estimated their ages were between 12 and 15.

Mr. Belisle believes that the FBI assumes he had a far more extensive collection because on his computer or computer paraphernalia, material that he thought he had deleted, when it may have been sent to him, may have continued to exist in some form.

After his arrest, Mr. Belisle immediately realized that he had been an "ass" for looking at the child pornography. "It so screwed up my life," he said. He told his wife who considered his behavior to be similar to an illness. He also told, with great shame, family and friends. He stated that for the most part everyone was disappointed with him but also supportive of his legal ordeal. As previously cited, he soon after entered therapy.

Mr. Belisle stated that he has lost all interest in internet pornography. He stated he has no desire to do anything with his computer other than simply checking his email. He stated that since he has turned away from the internet, he is much happier. He stressed that his previous child-pornography involvement was always self-contained, that he always considered his internet interests to be unreal and fake, never related to his life beyond the computer.

CONCLUSIONS

There is little doubt that Mr. Belisle has been involved in computer and internet-related child pornography. He acknowledges some of the actions for which he is accused, specifically, posting two images of a child pornographic nature and having in his possession 7-10 images that would be considered child pornographic. He does not believe he knowingly had the store of child pornography attributed to him nor does he believe he knowingly posted 10 child pornographic images to the internet.

There is little doubt that Mr. Belisle has been sexually frustrated for many years and has sought outlets for his sexual frustration outside of his marriage. These include having a number of extramarital encounters (including one long term extramarital relationship that became more emotionally focused), visiting strip clubs, looking at sexually explicit videos, masturbating to pictures and stories in more main stream magazines as well as more "specialized" magazines, as

well as masturbating to images and perhaps stories on the internet. Prior to his involvement with the internet over the last few years, he found himself aroused by more taboo topics, often that which was incest-themed. He sought out this taboo and illegal material, incest-themed and child(young teenager) pornographic, on the internet as well.

Mr. Belisle's reactions since the raid are, I believe, significant. First, he was emotionally shaken by the raid. He seemed to be upset when he learned that child pornography is harmful to children. He seemingly had been existing in a bubble in which he did not think about the implications of the pictures, that some child had been forced to be involved in some sexually graphic encounter. Second, he did not deny his actions (or at least he acknowledged some of his actions). Third, he recognized quickly that he had a psychological problem. Fourth, he did not hide his legal trouble from family or friends but instead spoke with them about what he had done. . Fifth, he sought therapy, not as a legal ploy or in response to a suggestion from his attorney, but because he recognized he had a problem. Sixth, he has reportedly put an end to his interest and fascination with internet pornography, including child pornography.

Perhaps it would be clinically valuable to attempt to differentiate Mr. Belisle's sexual interests from those of other adults. Clearly, he is not someone who has been satisfied emotionally or sexually in his marriage. He is someone who has sought sexual gratification outside the marriage in many different areas, including pornography, and including an interest in incest-themed pornography. Once he "discovered" the internet, his tastes for forbidden and taboo material "developed" further, leading him to seek out and involve himself in child pornography. Whether it has a bearing on his court case, he seems to have *wandered* off into child pornography although it needs to be noted that his interest in incest-themed material, which would involve children/teenagers, antedated his involvement with the computer. He seemingly yielded to the common invitations posed by the internet and took advantage of the ready availability of child pornography. He seems to have slid into this world and been changed in an addictive direction by his repeated exposure.

But his interest was never exclusively child pornography. He sought out and was aroused by a broad range of material. He is not someone whose interests are primarily pedophiliac. He is not someone whose inner essence needs to be understood through his interest in sexual images of young children. In my experience, there are some sex-offenders whose very essence is their sexual attraction to young children. For those sex offenders, it is nearly as impossible to

eliminate their sexual attraction to young children as it would be to shift the sexual attraction of a normal adult to some more deviant object. Mr. Belisle is not that kind of person. Frightened, chastened, shocked to his senses, he has seemingly given up his fascination and involvement with deviant and taboo pornography, be it on the computer or elsewhere. This "giving up" would not have been possible, were Mr. Belisle "haunted" by child pornography and a sexual attraction to children.

Also it should be noted that Mr. Belisle, as far as I can tell, compartmentalized his sexual interests in children to images and stories that he knew were not related to his day-to-day life. By this I mean that he kept his sexual interest in children in the world that existed between him and his computer and that he did not act in any way, based on the information available to me, in the world of people about him on his pornographic interests. In other words, his interest on images of child pornography, as far as I can tell, was not a prelude to action, a preparation for action, or a rehearsal for action. There is no information that indicated he has had predatory predilections. His interest appeared to be solely fantasy based.

I do not have information that Mr. Belisle ever acted in sexually perverse ways with any children, including his own daughter. I do not believe it necessary to link his daughter's psychological problems with her father's interest in child pornography. There are so many causal factors for the development of emotional problems in general that it is simplistic to link his involvement with child pornography on the computer with his daughter's psychological problems. His involvement with child pornography is most likely symptomatic of other problems in his life (for example, a distance in his marriage) which may, speculatively, have fostered problems with his daughter.

This report is not intended to excuse in any way Mr. Belisle's involvement with child pornography. He clearly made choices that have been available to many others on the internet which they have had the good judgment to avoid. Factors in his life that have influenced him---his father's infidelity, his feeling since childhood that he has always been "stuck" or trapped in relationships, his molestation as an early teenager, his marital dissatisfaction for whatever reason over the years---are not factors that have led ineluctably to his involvement in child pornography. They are factors that most likely have made it more complicated for him to find sexual satisfaction in life, but they did not propel him toward an involvement with child pornography. Many people have been affected by a similar level of disturbed formative relationships in

their lives without involving themselves in child pornography. These factors need to be understood, but ultimately it was Mr. Belisle who made certain choices in his life, choices which we must also recognize, have become too easy today for frustrated people to make.

Mr. Belisle understands well, and seemingly accepts, that there will be legal consequences for his actions. My view, based on his behavior over the past year in which he has reportedly placed great distance between himself and pornography, his involvement in therapy, his behavior with me during this evaluation, and his psychological make-up, which I view as one in which a sexual interest in children is not an essential feature of his personality, is that his risk of re-offending or acting in some other sexually deviant way should not be viewed as being particularly high. I think this is a man who has learned a painful lesson. Furthermore, as a result of sentencing, (and if the sentencing were not to include incarceration), were the court to maintain some continued involvement in his life, the risk of any re-offending would be lessened further.

Clearly Mr. Belisle needs to continue in therapy. I do not believe there is any specific treatment for adults who have had an interest in internet child pornography proven to be any more effective than basic psychotherapy that is infused with the therapist and client's openness and honesty about the presenting problem. Mr. Belisle has apparently been open with his therapist about his problem, and the therapist has seemingly helped Mr. Belisle re-orient his life. I would not necessarily change this treatment. If the court were to decide that more treatment was indicated, Mr. Belisle could be recommended to a sex-offender group. I would not view this as being overly helpful in terms of helping Mr. Belisle understand further his problem. However, it could serve as yet another buttress against a risk of re-offending.

If Mr. Belisle were not incarcerated, the most helpful additional therapeutic intervention, I believe, would be couples counseling for him and his wife. This is not a case in which there is fighting between the couple that needs to be resolved; in fact, it is just the opposite, it is too ready acceptance on the part of Ms. Belisle of Mr. Belisle's behavior. I suspect that the fear of incarceration has led to this too rapid understanding on her part of her husband's situation. I think the two of them need to open up in therapy the issues that drove them apart emotionally for years and allow her to understand better her reactions to his use of child pornography. I suspect that the two have never really aired all the issues between them over the years. I suspect they are prone to keep things to themselves. If these

issues can be surfaced, explored, and understood, the two will be closer and there will be less chance of re-offending on Mr. Belisle's part. Whoever the therapist is(I would recommend a therapist other than Mr. Belisle's current therapist so that there are more professionals involved in the case), there should be open communication between the couples therapist and Mr. Belisle's therapist.

Michael S. Sherry, Ph.D.
Licensed Psychologist

# EXHIBIT B

Dear Judge Ponser,

My husband + I have been married for over 23 years. He is a good husband + father. He has never been disrespectful to me. He is a superintendent for a construction company which has many responsibilities. He is good at his job + works very hard to provide for his family.

All through the years we get together with our families for holidays + birthdays. He has never shown any inappropriate behavior with any of the nieces or nephews. What he did was wrong. He is still seeing a counselor. He is the breadwinner in the family. For him not to be here would be an emotional + financial burden on my daughter + myself. We both love him + his absence would be especially difficult on our daughter. He has never been in trouble with the law. He is a very kind, loving hard working man. Please please consider something other than jail time.

Thank you very much

Sincerely

Linda Belisle

# EXHIBIT C

January 26, 2006


Dear Judge Ponsor:

I am writing this letter on behalf of my son, William Belisle. At the age of 71 and with my oldest son living in California, I rely a great deal on Bill for help in many instances. Bill has always been a very caring and loving son to me and a great brother, especially to his two sisters.

Bill's father left the family when Bill was nine years old. It was a hard time for all of us and very difficult trying to care for my four children with the youngest being four years old. I think Bill always felt that it was his responsibility to care for all of us. To this day when I call him on the phone, he always says, "What do you need, Mom?"

When his sisters were younger and in school, he always tried to help with whatever problems would come up, and he always said, "That's my job, Mom." He even paid for his oldest sister's wedding gown when she got married. A couple of years ago when she went through a divorce, Bill was right there to help her in any way that he could. To this day, if I should thank him for helping with something, he'll say, "That's my job."

My children are the only family I have left and are a great source of help and understanding to me. I don't know what I would do without my children and grandchildren.

Bill's little family consists of his wife, Linda, and his daughter, Bridget. They desperately need him home with them. Bridget has some very serious problems having quit school and not having a job and being very strong willed. Now she is having some physical problems. She had a large growth removed from her neck in the fall and now it has returned and she has to have it removed again. This time, it's more serious, affecting the nerves in her face. I have to give Linda credit. She has been through a lot with all Bridget's problems and now, Bill's. She is a very loving daughter-in-law to me.

As far as my grandchildren are concerned, they all love Uncle Joe, as they call Bill. He's the one to take them fishing, who showed my grandson how to plant seeds in the garden, who will toss Easter eggs with them. They're always happy to see Uncle Joe.

I'm not saying that Bill didn't do anything wrong and doesn't deserve punishment, but I really can't see how putting him in jail will do anyone any good, especially Bill and his family. They really need him to be with them. If he could help others by doing community service of some kind, that would be of benefit to the community. He is the first one to say that what he did was terrible, an awful thing and hurt so many people, but please do not send him to jail because that would hurt his family so much and they are completely innocent.

Page 2

Thank you for listening to my rambling but my son means everything to me and I don't think I would have survived and be where I am today without Bill and my other children.

Once again, thank you for your consideration.

Sincerely,

Ann A. Belisle

# EXHIBIT D

January 30, 2006

Dear Judge Ponsor,

I write this letter in reference to my brother, Bill Belisle. He has taken care of this family since our father left us when I was eight years old. Billy loves his family very much and we love him. He has always been there for me when I needed help. Through my divorce and the illness of my daughter, who was hospitalized for a year and a half, Billy has been there for support sometimes monetary sometimes just to talk and times when my house needed repairs even though he had worked a 10 or 12 or 14 hour day, he has always been only a phone call away.

The time that he was not allowed to see his nieces and nephews, he was miserable and so very depressed. The kids love him also! I have recently re-married and my 2 stepsons call him Uncle Joe just like the rest of the kids. He is the only one they call uncle- his wife and my sister and her husband and myself- my stepsons call us by our first names but not Uncle Joe.

His family loves him dearly. Please don't take him away from us.

Sincerely,

Louise A Chase
174 Poole Street
Ludlow, MA 01056

# EXHIBIT E

February 5, 2006

Dear Judge Ponsor:

I am writing this letter on behalf of my brother, William Belisle. From the beginning of this entire ordeal over a year ago, Bill's concerns have not been with himself and what will happen to him, but with his family. He worried about my mom, me and my sister, and about our children. My husband and I have three children, aged 12, 9 and 5, who are all always thrilled to see Uncle Joe, as Bill is known in our family. While as a mother, I was appalled by his actions, as a mother who knows her children and knowing the kind of person Bill is, there has never been a question in my mind that Bill could directly or consciously hurt a child – ever. I am *not* a stupid woman – I understand the ramifications of his actions but my brother is *not* a monster. He is a kind and gentle person who did a very stupid thing. He has also taken full responsibility for his actions from the very beginning.

This has been a painful time for all the adults involved and my husband and I have chosen not to discuss this with our children until the time might arise to make that necessary. I am hoping that time will not come. During the portion of this past year when the court forbade Bill from having any contact at all with any children, there was a great sense of loss in my family. My children did not understand why they couldn't call Uncle Joe on the phone, why he wasn't at family gatherings or why if we went to my mom's house and he was there, he left without a hug or a visit. They missed him. He complied with the orders, but it broke everyone's heart doing it. My oldest son, Nate, has always been close to him. Having no son of his own, he has always taken Nate fishing or working with him and they have enjoyed being together. Nate had looked forward to turning 12 so that he could go with Uncle Joe hunting, a sport which Bill has always loved. Nate does not yet know that hunting will no longer be possible for Bill.

As adults, the thought of my brother going to jail is horrifying enough for us, especially my mother. For a young child, the thought of someone they love dearly going to jail would be incomprehensible. Please do not put my children through this pain and please do not restrict him from being with them. He is an important part of their lives.

Thank you for your time and your thoughtful consideration.

Sincerely,

Suzanne Crowther

# EXHIBIT F



**Wing Memorial**
Hospital and Medical Centers
A Member of UMass Memorial Health Care

40 Wright Street
Palmer, MA 01069
Tel: 413-283-7651

To:     Whom it may concern                    1-26-06

From:  Thomas Levy, M.Ed., LMHC
       Griswold Center, Wing Memorial Hospital
       Palmer, MA 01069
       413-284-5379, fax 413-284-5384

Re:    William Belisle, DOB 11/14/59

     I have been counseling Mr. Belisle at the Griswold Center since 11-23-04.
He has attended 20 sessions during that time frame. He initially came seeking help to
control his addictive behavior with pornographic voyeurism. He has openly and sincerely
asked for help and has conscientiously worked on his issue. He has made significant
progress in that area, moving from initial denial, then through acceptance of his problem
and then leading to his current self-awareness and ability to maintain abstinence from his
need for titillation through voyeurism. He also appears to have made the link between
this and other problematic behaviors such as smoking and gambling. I do think Mr.
Belisle certainly could benefit some from attending a twelve step program for addictive
behaviors to increase his self awareness and for support in maintaining self vigilance.
At this stage of his progress I really do not see him as a threat to his family or the
community.
     As to his family, from my experience in working with sex offenders, I do not see
him as a threat to his daughter. He does not fit the typical profile for an incestuous parent.
His concern for his daughter has consumed quite a bit of his attention and worry in
therapy. Also, he does not show signs of a dominating or controlling attitude with her. On
the contrary, he has difficulty setting limits for her and can not bring himself to force her
do anything even if he knows if would be good for her. This appears to be a deeply held
attitude by him, and indicates a strong unlikelihood of parental abuse.
     I have also helped him with coping skills for dealing with the problems and
disruptions to his life and family, which his arrest has caused. He appears very dedicated
to supporting his family, both emotionally and financially.
     It is my opinion that incarcerating Mr. Belisle is unnecessary to add greater safety
to the community or create a more effective deterent for any future behaviors of his. If
you have any further question feel free to contact me.

Respectfully submitted,

Thomas Levy, M. Ed, LMHC, ma lic.#4220

*Wing Medical Centers  Belchertown, MA • Ludlow, MA • Monson, MA • Palmer, MA • Wilbraham, MA*



# MAX CONSTRUCTION COMPANY

316 Leech Avenue, Saltsburg, PA  15681  ~  Phone:(724) 639-9458 ~ Fax: (724) 639-358⋮

February 3rd 2006
Attn: Judge Ponser
RE: William Belisle

Your Honour,

    I have known and worked with Bill for over eight years. My first encounter with Bill began while he was a subcontractor working with our company. He was hired by Max Construction Co. as a superintendent in May of 2000.

    Bill has worked under my supervision on numerous projects. I can confirm that Bill is one that takes charge, runs the job and makes things happen. He is a planner, organizer and coordinator working closely with owners, subcontractors, suppliers and myself. He has always given 110% and is dedicated to doing his job well.

    Throughout the years, I have also come to know that Bill is extremely dedicated to his family. On numerous occasions I have known Bill to unselfishly give of himself, helping his daughter and mother through difficult times being available and supporting them both financially and emotionally.

    Being the Senior Project Manager, with over 25 years working for Max Construction Co., I have worked with many superintendents and find Bill to be one of the most conscientious and able employees that I have encountered. Bill always gives of himself and is dedicated to the team.

    Bill has been completely open and honest with me from day one, concerning his situation. We have talked about it many times and are aware that one can not take back what has been done. I sincerely believe that Bill has received his wake up call and regrets the poor choice he made. It is one choice he won't make again.

Thank you for your time.

Sincerely,

Michael J. Parobek
Senior Project Manager

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) **Criminal Action No.: 05-30051-MAP** |
| | ) |
| WILLIAM BELISLE | ) |

---

## CERTIFICATE OF SERVICE

---

I, Joseph D. Bernard, hereby certify that a true copy of the foregoing Motion for Downward Departure and Memorandum in Support was served upon the United States Attorney's Office, Federal Building and Courthouse, 1550 Main Street, Springfield, MA by HAND DELIVERY on the date hereof.

Joseph D. Bernard /djr/
Joseph D. Bernard
The Law Offices of Joseph D. Bernard, P.C.
73 State Street, Suite 301
Springfield, MA 01103
(413) 731-9995
(413) 730-6647 fax
BBO#:  557986

Date:   February 21, 2006